MIDDLESEX MUTUAL ASSURANCE COMPANY *v.*
DONALD F. WALSH, SR., ADMINISTRATOR
(ESTATE OF DONALD F. WALSH, JR.)
(14127)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, HULL and BORDEN, Js.

Argued December 4, 1990—decision released May 14, 1991

*Charles A. Deluca,* with whom, on the brief, was *Holly K. Dustin,* for the appellant-appellee (plaintiff).

*Susan M. Cormier,* with whom were *Wesley W. Horton* and *Melvin L. Bloomenthal,* for the appellee-appellant (defendant).

GLASS, J. This is an appeal by the plaintiff, Middlesex Mutual Assurance Company (Middlesex) from the judgment of the Superior Court confirming a $275,000 uninsured motorist arbitration award in favor of the defendant, Donald F. Walsh, Sr. (Walsh), the admin-

istrator of the estate of his son, Donald F. Walsh, Jr. (Donald), and a cross appeal by Walsh from the court's ruling regarding his entitlement to interest on the award. On the appeal, Middlesex claims that the arbitration panel and the trial court improperly determined that: (1) Donald was covered as a "resident of the household" of Walsh within the meaning of the terms of the automobile liability insurance policy issued to Walsh by Middlesex Mutual Automobile, a division of Middlesex; (2) statements made by Walsh on his application for the policy did not constitute material misrepresentations; and (3) the doctrine of estoppel did not bar Walsh from asserting that Donald was a resident of his household as a basis for recovery under the policy. On the cross appeal, Walsh raises the sole claim that the court improperly determined that he was entitled to recover interest on the award only from the date of the judgment confirming the award and not from the earlier date of the award. We affirm the judgment on the appeal, and on the cross appeal, we vacate the judgment and remand the case for further proceedings regarding Walsh's entitlement to interest on the award.

The facts are as follows. While walking across River Street in Bridgeport in the early morning hours of November 2, 1987, Donald was fatally injured by a motor vehicle operated by Steven Rivera, also known as Steven Raslavsky. Rivera had recently stolen the vehicle, and neither he nor the vehicle was insured. Thereafter, Rivera was charged with the crime of murder, but pleaded nolo contendere to manslaughter in the first degree.

As administrator of Donald's estate, Walsh filed a claim under his policy with Middlesex to recover uninsured motorist benefits for the death of Donald. Pur-

suant to General Statutes § 38-175c (a) (1),[1] the claim was submitted to compulsory arbitration before a panel of three arbitrators. The panel, one arbitrator dissenting, found in favor of Walsh and awarded $275,000 to Donald's estate on April 3, 1989. Middlesex then moved to vacate the award in the Superior Court pursuant to General Statutes § 52-418 (a) (4),[2] and Walsh moved to confirm the award pursuant to General Statutes § 52-417.[3] On November 27, 1989, the trial court confirmed the award, and in a subsequent articulation of its decision, ruled that Walsh was entitled to recover interest on the award from the date of the judgment confirming the award rather than from the date of the award as claimed by Walsh. Thereafter, Middlesex appealed to the Appellate Court from the judgment confirming the award and Walsh cross appealed from the court's ruling concerning interest on the award. We transferred the appeal and the cross appeal to this court pursuant to Practice Book § 4023.

---

[1] General Statutes § 38-175c provides in pertinent part: "UNINSURED MOTORIST COVERAGE. (a) (1) Every such policy shall provide insurance, herein called uninsured motorist coverage . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles . . . Every such policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such arbitration proceeding. . . ."

[2] General Statutes § 52-418 provides in pertinent part: "VACATING AWARD. (a) Upon the application of any party to an arbitration, the superior court . . . shall make an order vacating the award if it finds any of the following defects . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[3] General Statutes § 52-417 provides in pertinent part: "APPLICATION FOR ORDER CONFIRMING AWARD. At any time within one year after an award has been rendered and the parties to the arbitration have been notified thereof, any party to the arbitration may make application to the superior court . . . for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

## I

Middlesex first claims that the arbitration panel and the trial court should not have found that Donald was covered under the policy as a "resident of the household" of Walsh. After reviewing the record of the arbitration proceedings provided by the parties, the court ruled that "substantial evidence" supported the arbitrators' determination that Donald was a resident of Walsh's household.[4]

Middlesex' challenge to the ruling focuses upon the inferences drawn by the court from the facts pertaining to Donald's residence. Specifically, Middlesex argues that the court "overlooked, misapplied, ignored and gave an improper effect" to certain statements made by Donald to the authorities at medical institutions and to the police indicating that he lived at places other than Walsh's household, or that he was homeless. Middlesex contends that these statements express Donald's belief that he was not a resident of Walsh's household, and thus "point to the sole conclusion that he did not reside at [Walsh's] home." The court's contrary conclusion, according to Middlesex, rested improperly upon "unsupported speculation that [Donald] was delusional on the numerous occasions when he gave his address (or lack of one) to third parties," the testimony of Donald's family that Middlesex characterizes as "conclusory in nature and based more on opinion than fact," and various objective factors that Middlesex claims do not conclusively establish that Donald was a resident of Walsh's household.

Essentially, Middlesex urges us to fashion a new analysis for the determination of whether a person is a

---

[4] Because the court found that "ample evidence" supported the arbitrators' determination, and, in addition, reached the same conclusion after reviewing the record de novo, the court implicitly found that substantial evidence supported that determination.

resident of a particular household that would lend controlling significance, to the exclusion of other objective factors, to the intent of the person as to where he or she resides. Our prior decisions on the issue of household residence do not support such a restricted analysis. In *Griffith* v. *Security Ins. Co.*, 167 Conn. 450, 454, 356 A.2d 94 (1975), for example, a case involving uninsured motorist coverage of an alleged household resident under the terms of a policy virtually identical to those at issue here, we construed the unambiguous phrase "resident of the same household" in its common and ordinary sense as defined in Webster's Third New International Dictionary: " 'those who dwell under the same roof and compose a family: a domestic establishment; specif: a social unit comprised of those living together in the same dwelling place.' " In accordance with the two primary elements that emerge from this definition, we considered in *Griffith* whether the facts were sufficient to establish that the father who claimed to be a resident of his son's household had a close, family-type relationship with the inhabitants of that household, and, in addition, that he actually lived in the household. Id., 455–57.

While we found it relevant in the latter respect that the father had testified that he lived in a different place; id., 457; we did not suggest that his intent as implied from his statements was dispositive evidence that he was not a resident of his son's household. Rather, we focused primarily upon the objective factors relevant to the dual considerations noted above, including the frequency of the father's contact with the inhabitants of his son's household, that he stayed overnight and ate meals there, that he maintained a separate apartment and kept the bulk of his personal belongings, personal and business records and received mail at his apartment address, and that he used the address of his

apartment for formal purposes such as voting, motor vehicle registration and paying income tax. Id., 455–57. We considered, moreover, the statements of other witnesses regarding their perception of where the father lived. Id., 457. The ultimate determination as to whether the father was a resident of his son's household therefore rested upon our evaluation of a conglomeration of factors. See also *Rathbun* v. *Aetna Casualty & Surety Co.,* 144 Conn. 165, 169, 128 A.2d 327 (1956).

Furthermore, aside from the possibility that Donald's statements regarding where he lived may have been delusional, we do not agree with Middlesex that his intent evidenced by his statements, or that evidenced by the statements of any other alleged household resident, should control the outcome of the residence determination. Such an approach would inappropriately transform the residence inquiry into a mere weighing of contradictory expressions of intent, thereby diminishing the significance of the objective factors that we have previously found indicative of household residence. See *Griffith* v. *Security Ins. Co.,* supra, 455–57; *Rathbun* v. *Aetna Casualty & Surety Co.,* supra. Certainly, had Donald's statements unanimously expressed his belief that he lived in Walsh's household, Middlesex would not favor the narrow analysis it now urges us to undertake. In neither case would it be appropriate to attach controlling significance to such expressions of intent.

We therefore adhere to the approach to the issue of household residence outlined in *Griffith,* that is, the statements expressing the intent of a claimed resident as to where he or she lives are merely one factor among many to be considered in determining household residence. Applying the foregoing principles to the facts of this case, we conclude that the court properly deter-

mined that the arbitrators were possessed of substantial evidence to support their determination that Donald was a resident of Walsh's household. See *Chmielewski* v. *Aetna Casualty & Surety Co.,* 218 Conn. 646, 660–61, 591 A.2d 101 (1991).

The record reveals that Donald had suffered from chronic schizophrenia since the early 1970s. As a consequence, he was hospitalized for varying periods from the time that his illness first manifested itself until his death. Those of Donald's siblings who lived at Walsh's household testified that Donald, their oldest brother, was an integral part of Walsh's "close-knit" family notwithstanding his illness and frequent hospitalizations. His sister testified that after he became ill, "it was [her] turn to take care of him." As noted by the court, moreover, Donald "spent a great number of his days and nights during the years prior to his death at his parents' home, listening to music, playing his guitar, writing poetry, sometimes taking long walks and visiting his brothers and sisters. There is no doubt that he visited and stayed overnight with friends and of course he was institutionalized many times, but he always came home eventually. The family members who testified were unanimous in saying that he was welcome at the home and that is where he lived, and that he did not live anywhere else."

In addition to Donald's evidently close relationship with the inhabitants of Walsh's household, the court noted that a variety of objective factors indicated that he actually lived in the household. For example, "[h]e had his own bedroom at the house and no one else slept in that room. His clothes were kept in a chest of drawers in the house, and he had other personal possessions which always remained there." Compare *Griffith* v. *Security Ins. Co.,* supra. According to his family members, Donald never moved his belongings

out of Walsh's house even when visiting friends, staying in shelters and recuperative halfway houses or simply wandering.[5] Compare *Rathbun* v. *Aetna Casualty & Surety Co.*, supra, 169. He received mail at the Walsh address, including bills, medical group information, community center agendas, college alumni magazines and reports, letters and birthday and Christmas cards. Compare *Griffith* v. *Security Ins. Co.*, supra. Donald's social security check, his only source of income, was mailed to the Walsh address in care of his mother, who deposited, cashed and disbursed the proceeds to him as necessary. In addition, he was registered to vote at Walsh's address. Compare id.

Against the above evidence, the court weighed Donald's statements to the authorities at medical institutions and to the police indicating that he lived in places other than the Walsh household. There was additional evidence, however, that Donald had identified himself to a police officer as Robert Hood, also known as Robin Hood, with no address but the forest, had given the wrong birth date to medical authorities, and, although unemployed and without a vocation, had described himself to medical authorities as a "freelance writer." Members of his family testified that Donald was known to fabricate stories, and "really was in a fantasy land." In light of this evidence, the court reasonably attributed Donald's statements to his frequent "delusionary state."

Furthermore, while Donald's mother testified that Donald had been most lucid when released from medical institutions after regimented treatment, and on several of such occasions he had given his address of discharge as one other than the Walsh address, the

---

[5] The court stated: "Evidently, during these periods of absence from the home he was in effect a street person, or drifter, sometimes staying at a shelter, a half-way house, or occasionally with friends or at a YMCA."

court may well have concluded that these statements merely expressed Donald's desire to be independent and to live on his own. Donald's mother testified that one of the long-term goals of Donald's treatment was his ultimate maintenance of an independent living situation, and that he had at times responded favorably to her suggestions that "maybe some time we can get you an apartment." Nonetheless, there was no evidence that Donald ever took permanent measures to achieve this goal; compare *Rathbun* v. *Aetna Casualty & Surety Co.*, supra; or that he was capable, either financially or emotionally, of establishing and maintaining a household separate from that of his parents. See *Row* v. *United Services Automobile Assn.*, 474 So. 2d 348, 352 (Fla. App. 1985). In view of all of the evidence adduced at the arbitration hearing, therefore, we cannot say that the trial court improperly concluded that despite Donald's periodic wanderings and statements to the contrary, substantial evidence supported the arbitrators' determination that he was a resident of Walsh's household. See *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra.

## II

Middlesex next claims that Walsh's statements in response to two questions on his application for automobile insurance constituted material misrepresentations that voided the policy, thereby defeating Walsh's claim to recovery under the policy. The questions and Walsh's respective answers are as follows: (1) "List all children in the household (Names and dates of birth)," to which Walsh responded by placing a dash mark in the space designated for his answer; and (2) "Has any operator in the household had his/her license revoked or suspended during the past 5 years," to which Walsh responded by marking the "No" box designated for his answer.

Before addressing whether the arbitration panel and the court properly determined that Walsh's answers did not constitute material misrepresentations, we must consider Middlesex's preliminary claim that material "misrepresentations in an insurance application invalidate the policy even when innocently made." Commentators note that "[t]here is a conflict of authority as to the effect to be given a misrepresentation of material fact when innocently made, that is, where the insured made misstatements because of ignorance, mistake, or negligence, but in fact exercised good faith." 7 G. Couch, Cyclopedia of Insurance Law (2d Ed.) § 35:119. "In those jurisdictions in which emphasis is placed upon the moral character of the insured's conduct, it is generally held that the contract of insurance is not voidable because of innocent misrepresentations. In those in which prime attention is focused upon the fact that the insurer has been misled, it is generally held that the contract is voidable because of the misrepresentation, however innocent." Id., § 35:118. As support for its claim that Connecticut falls within the group of jurisdictions that follow the latter rule, Middlesex relies upon two cases involving alleged misrepresentations in life insurance applications. See *Guariglia* v. *John Hancock Mutual Life Ins. Co.*, 139 Conn. 54, 57, 90 A.2d 162 (1952); *Kelly* v. *John Hancock Mutual Life Ins. Co.*, 131 Conn. 106, 110, 38 A.2d 176 (1944); see also *Jeffe* v. *Monarch Life Ins. Co.*, 123 F. Sup. 173, 175 (D. Conn. 1954).

In our most recent decision in the life insurance context, however, we stated that "a misrepresentation material to the risk that is *knowingly made* by a proposed insured will defeat recovery under a life insurance policy." (Emphasis added.) *Bristol* v. *Commercial Union Life Ins. Co. of America*, 211 Conn. 622, 628, 560 A.2d 460 (1989). Our statement was based in part upon *State Bank & Trust Co.* v. *Connecticut General*

*Life Ins. Co.,* 109 Conn. 67, 72–73, 145 A. 565 (1929), wherein this court held that "[m]aterial representations . . . relied on by the [insurance] company, which were untrue, *and known by the assured to be untrue when made,* invalidate the policy without further proof of actual conscious design to defraud. . . . If it were necessary to prove an intent to deceive, such intent would be inferred from the making of the false representations with knowledge that they were false." (Emphasis added.) Our decision in *Bristol* therefore reaffirms the continuing viability of the principles announced in *State Bank & Trust Co.,* and, notwithstanding the cases referred to by Middlesex, demonstrates that we have rejected the line of authority holding that innocent misrepresentations are sufficient to void a life insurance policy.

Moreover, although we have not previously addressed the issue in the automobile insurance context, we find no persuasive reason, and Middlesex has offered none, why the principles governing misrepresentations on life insurance applications should not apply equally to misrepresentations on automobile insurance applications. We therefore hold that in order to constitute a misrepresentation sufficient to defeat recovery on an automobile insurance policy, a material representation on an application for such a policy must be known by the insured to be false when made. See *Bristol* v. *Commercial Union Life Ins. Co. of America,* supra; *State Bank & Trust Co.* v. *Connecticut General Life Ins. Co.,* supra. Having established the framework for evaluating Middlesex's material misrepresentation claims, we now turn to the merits of those claims.

A

The first claimed material misrepresentation in Walsh's application is his dash mark response to the question: "List all children in the household (Names

and dates of birth).'' Middlesex argues that this response was a misrepresentation because it indicated that there were "no children" in Walsh's household,[6] a representation contradictory to his position throughout the arbitration hearing that his son, Donald, was a resident of his household. According to Middlesex, this alleged misrepresentation was material to the risk of underwriting Walsh's policy since the number of children living in a household "is important in determining the risk based on potential driving exposures." Middlesex therefore maintains that if it had been aware that Donald lived in Walsh's household, it would have declined to afford coverage to Walsh. Because we are unpersuaded that Walsh's response was a misrepresentation, we need not consider whether the alleged misrepresentation was material.

As we have stated above, Walsh's response does not amount to a misrepresentation unless it was known by him to be false when made. See *Bristol* v. *Commercial Union Life Ins. Co. of America*, supra; *State Bank & Trust Co.* v. *Connecticut General Life Ins. Co.*, supra. A statement cannot be knowingly false, however, and thus cannot be a misrepresentation in this context, unless it is in fact false. Whether a response to a question in an insurance application is false must be determined in light of the question asked. 7 G. Couch, supra, § 35:145. If the question is "so framed as to leave room for two constructions, the words used in it should be interpreted most strongly against the insurer. *Rinaldi* v. *Prudential Ins. Co.*, 118 Conn. 419, 423, 172 A. 777 [1934]." *O'Brien* v. *John Hancock Mutual Life Ins. Co.*, 143 Conn. 25, 29, 119 A.2d 329 (1955); see *Schultz* v. *Hartford Fire Ins. Co.*, 213 Conn. 696, 702, 569 A.2d

---

[6] Since Walsh does not claim that his dash mark response means anything other than that no children lived in his household, we treat the response as having that meaning.

1131 (1990). "This rule—that the construction most favorable to the insured be adopted—'rests upon the ground that the company's attorneys, officers or agents prepared the [application], and it is its language that must be interpreted.' *Roby* v. *Connecticut General Life Ins. Co.*, 166 Conn. 395, 402, 349 A.2d 838 [1974]. The rule itself derives from the established principle of contract construction that, where the terms of a contract are equally susceptible to two different meanings, that favoring the party who did not draw up the contract will be applied. 'The premise operating behind the rule would seem to be a psychological one. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests.' *Ravitch* v. *Stollman Poultry Farms, Inc.*, 165 Conn. 135, 146 n.8, 328 A.2d 711 [1973]. A further, related rationale for the rule is that '[s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter.' 4 Williston, [Contracts (3d Ed.)] § 621, p. 760." *Simses* v. *North American Co. for Life & Health Ins.*, 175 Conn. 77, 84–85, 394 A.2d 710 (1978); see *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 584, 573 A.2d 699 (1990); *Cody* v. *Remington Electric Shavers*, 179 Conn. 494, 497, 427 A.2d 810 (1980).

In determining whether Walsh responded falsely to the question asked of him, therefore, we must construe the question as a lay person would understand it. *Cody* v. *Remington Electric Shavers*, supra; see *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.*, 214 Conn. 216, 223–24 n.5, 571 A.2d 107 (1990). "[I]f the inquiry is so framed that it does not clearly inform the insured of its meaning, and he may have

been honestly mistaken as to what was intended, and his answer, by fair and reasonable construction, may be considered a true one in response to the question as he understood it, such interpretation will be given, and a forfeiture precluded." 7 G. Couch, supra, § 35:145. Thus, if Walsh could reasonably have understood the question as calling for a particular response, and the response given in accordance with that understanding is not false, the response does not amount to a misrepresentation.

The dictionary definition of the word "child" is instructive as to the meaning that Walsh could reasonably have attached to the question asking that he list "all children in the household."[7] Webster variously defines the word "child" as: "an unborn or recently born person . . . a young person esp. between infancy and youth . . . a person not yet of age . . . a son or daughter of human parents . . . ." Webster's, Ninth New Collegiate Dictionary. Because these definitions indicate that a "child" most commonly means a person under the age of majority, Walsh could reasonably have understood the question as inquiring whether any underage person lived in his household. It is undisputed that Donald was a thirty-eight year old adult at the time Walsh filled out the application. We therefore conclude that Walsh's response to the question as fairly and reasonably construed in his favor was not false. Accordingly, the court properly determined that his response did not amount to a misrepresentation.[8]

---

[7] "Connecticut courts have consistently referred to dictionary definitions to interpret words used in insurance contracts. See *Continental Ins. Co.* v. *Cebe-Habersky*, 214 Conn. 209, 212, 571 A.2d 104 (1990); see also *Smedley Co.* v. *Employers Mutual Liability Ins. Co.*, 143 Conn. 510, 514–15, 123 A.2d 755 (1956); *Lyon* v. *Aetna Casualty & Surety Co.*, 140 Conn. 304, 308, 99 A.2d 141 (1953)." *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.*, 214 Conn. 216, 223–24 n.5, 571 A.2d 107 (1990).

[8] Furthermore, we note that construing the question as Walsh could reasonably have understood it eliminates any inconsistency between his

If Middlesex had intended the question to elicit a response disclosing the sons or daughters of any age living in Walsh's household so that it could ascertain the "potential driving exposures" that it deems material to an underwriting risk, it could have expressed that intent in a question drafted with greater precision. Having failed to do so, Middlesex cannot now avoid the policy on the basis of a statement generated by an ambiguity for which it was responsible.

## B

The second claimed material misrepresentation is Walsh's "No" response to the following question: "Has any operator in the household had his/her license revoked or suspended during the past 5 years." Middlesex attacks this response on the ground that Donald's automobile operator's license had been suspended, effective on December 17, 1983, for failure to appear in court to answer the charges of driving without a license and with faulty equipment. Since the suspension occurred within the five year period preceding the application date of January 26, 1987, Middlesex contends that Walsh's response was a misrepresentation. Middlesex argues for the materiality of this alleged misrepresentation by pointing to a minimum eligibility requirement of "no license suspensions or revocations in the household" that it had submitted to the Connecticut department of insurance. According to Middlesex, this requirement indicates that a license suspension in an insured's household impermissibly increases its exposure to risk, and therefore, it would not have issued the policy to Walsh if Donald's license suspension had been disclosed. Since we disagree with

response and his position at the arbitration hearing that Donald was a resident of his household. As the trial court pointed out, "the question did not ask [Walsh] to list all 'persons' residing in the household, for example, but only 'children.' "

Middlesex that Walsh's response was a misrepresentation, we need not reach the question of materiality.

As previously stated, a response to a question on an insurance application does not constitute a misrepresentation unless it is knowingly false. *Bristol* v. *Commercial Union Life Ins. Co. of America,* 211 Conn. 622, 628, 560 A.2d 460 (1989); *State Bank & Trust Co.* v. *Connecticut General Life Ins. Co.,* 109 Conn. 67, 72–73, 145 A. 565 (1929). The question asked of Walsh concerned the status of the licenses of "any operator in the household." Even if we were to assume that this question is unambiguous,[9] there is no indication in the record that Walsh knew or had reason to know that Donald had had a license during the five year period preceding the application, much less that his license had been suspended during that period.[10] Walsh testified

---

[9] While we have not previously construed the word "operator" as used in a question on an automobile insurance application, courts in other jurisdictions have found questions asking an applicant to list "operators" or "drivers" in a household to be ambiguous, and susceptible to reasonable interpretation by a lay person as calling for disclosure of "all those whom it was reasonably contemplated would be drivers of the insured automobile." *Gaskins* v. *General Ins. Co. of Florida,* 397 So. 2d 729, 731 (Fla. App. 1981) (construing the word "drivers"); accord *Patrons Mutual Ins. Co.* v. *Rideout,* 411 A.2d 673, 676–78 (Me. 1980) (construing the word "operators"). In this case, the persons reasonably expected to drive the vehicles insured by Walsh's policy were he and his wife, neither of whom had suffered a license suspension in the five years prior to the date of the application. Donald had been expressly prohibited from driving any of the vehicles, and in 1983, Walsh had instigated Donald's arrest for driving one of the vehicles without permission. Since Donald was not reasonably expected to drive the vehicles, Walsh could reasonably have understood the question concerning "operators" as inapplicable to Donald.

[10] In this respect, we observe that there is no evidence in the record to establish that the charges that Donald had failed to appear in court to answer, which failure resulted in the suspension, were in any way connected to his arrest for driving the family car without permission as noted in footnote 9, supra. Consequently, the fact that Walsh presumably knew of Donald's arrest for driving the family car does not support an inference that he also knew of the suspension.

at the arbitration hearing that the last time he remembered Donald having had a license was "probably his last year in college, which would have been '73-ish." This perception was shared by Donald's mother, who testified that Donald had had a license "in the early seventies," but did not recall that he had had a license during the period from 1977 to 1987. Donald had never owned a motor vehicle, and had been prohibited from driving the vehicles insured under Walsh's policy. Furthermore, neither Walsh nor Donald's mother recalled Donald ever having received any mail from the motor vehicle department, and Donald's mother testified that she had "looked at the mail every single day." There was no evidence, moreover, that Donald's parents regularly opened or read his personal mail, such that either of them would have discovered a notice of suspension of his license if one had been mailed to the Walsh address.

"[S]ince an insured makes a knowing misrepresentation only when he submits an answer to a question in the application other than that which he has reason to believe is true, *Lazar* v. *Metropolitan Life Insurance Company,* 290 F. Supp. 179, 181 (D. Conn. 1968), it follows that an insured should not be held responsible for an answer in the application if he was justifiably unaware of its falsity, had no actual or implied knowledge of its existence, and was not guilty of bad faith, fraud, or collusion." *Lewis* v. *John Hancock Mutual Life Ins. Co.,* 443 F. Sup. 217, 218 (D. Conn. 1977). In the absence of any indication that Walsh knew or had reason to know that Donald's license had been suspended in 1983, we cannot say that the court improperly concluded that Walsh's representation that no operator in his household had suffered a license suspension or revocation during the five years preceding the application was known by him to be false when made. See

*Bristol* v. *Commercial Union Life Ins. Co. of America,* supra; *State Bank & Trust Co.* v. *Connecticut General Life Ins. Co.,* supra.

### III

Middlesex' final claim is that Walsh should be estopped from asserting that his son Donald was a resident of his household as a basis for recovery under the policy because he had represented on his application that no children lived in his household. According to Middlesex, it would not have issued the policy to Walsh if he had not made the representation, and thus it relied upon the representation to its detriment. We are unpersuaded.

Under Connecticut law, " ' "any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . ." ' " (Citations omitted.) *O'Sullivan* v. *Bergenty,* 214 Conn. 641, 648, 573 A.2d 729 (1990). It is the burden of the party asserting a claim of estoppel to establish the existence of the elements essential to an estoppel; see *Cleary* v. *Zoning Board,* 153 Conn. 513, 518, 218 A.2d 523 (1966); and whether that burden has been satisfied in a particular case is an issue of fact. *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.,* 217 Conn. 340, 350, 586 A.2d 567 (1991); *New York Annual Conference* v. *Fisher,* 182 Conn. 272, 300, 438 A.2d 62 (1980). The trial court's factual determination will not be disturbed unless it is clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980); see *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.,* supra.

The only evidence of detrimental reliance presented by Middlesex at the arbitration hearing was the testi-

mony of James McClintock, the underwriting manager for Middlesex Mutual Automobile. While McClintock testified that Middlesex used information regarding children in a household to evaluate the maturity and responsibility of a named insured and the "risk based on potential driving exposures, licensed or not licensed in the household," he also testified that Middlesex had "what we consider a subjective approach to underwriting and it's, again, a gut feeling, based on gut feeling." The subjective approach, in McClintock's view, was also "based on [written eligibility criteria] to make a rational, common sense judgment call on each case based on the information provided on the application." At no time did Middlesex demonstrate, through McClintock's testimony or otherwise, that any of its written eligibility criteria or its "subjective approach" to underwriting required the rejection of an application for the sole reason that a child lived in the applicant's household.[11] Middlesex' claim for estoppel, as we have noted, rests upon the inconsistency between Walsh's representation on his application that no children lived in his household and his subsequent position at the arbitration hearing that Donald was a resident of his household.

In view of the lack of evidence demonstrating that Middlesex detrimentally relied upon the fact that it seeks to estop Walsh from asserting, we conclude that it was not clearly erroneous for the court to determine that Middlesex failed to satisfy its burden of establishing the existence of the elements essential to an estoppel.

[11] In fact, in response to a hypothetical question including all pertinent information relating to Donald, McClintock testified that Walsh's application would have been rejected because "[w]e feel that any individual who has their license revoked or suspended within the last five years under almost any circumstances is enough for declination because . . . [w]e put a lot of credence on maturity and responsibility of every individual in the household."

## IV

In his cross appeal, Walsh claims that the court should have found that he was entitled to recover interest on the arbitration award from the date of the award. He asserts that in ruling that he was entitled to recover interest only from the later date of the judgment confirming the award, the court improperly adhered to the principles governing interest allowable on an arbitration award set forth in *Gary Excavating Co.* v. *North Haven,* 163 Conn. 428, 311 A.2d 90 (1972). As Walsh points out, *Gary Excavating Co.* was decided before the amendment of General Statutes § 37-3a by Public Acts 1979, No. 79-364, which specifically allowed recovery of interest on an arbitration award. He claims that the broad language of § 37-3a, unlike the statutory provisions involved in *Gary Excavating Co.,* permits the recovery of interest on an arbitration award prior to the date of the judgment confirming the award. We agree with Walsh insofar as he claims that prejudgment interest on an arbitration award is permissible.

Section 37-3a provides, with certain exceptions inapplicable here, that interest "may be recovered and allowed in . . . arbitration proceedings under chapter 909 . . . as damages for the detention of money after it becomes payable . . . ." The proceeding commenced by Middlesex to vacate the arbitration award under General Statutes § 52-418, a provision contained in chapter 909 of the General Statutes, is unquestionably one in which the legislature intended that prejudgment interest might be recovered. In accordance with the permissive language of § 37-3a; see *White Oak Corporation* v. *Department of Transportation,* 217 Conn. 281, 302, 585 A.2d 1199 (1991); we have stated that " '[t]he allowance of interest as an element of damages is primarily an equitable determination and a matter

within the discretion of the trial court.' " *Metcalfe* v. *Talarski,* 213 Conn. 145, 160, 567 A.2d 1148 (1989); *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 482, 542 A.2d 692 (1988). While the determination depends in part upon when the money involved is "payable"; see General Statutes § 37-3a; see also *White Oak Corporation* v. *Department of Transportation,* supra; "[t]he real question in each case is whether the detention of the money is or is not wrongful under the circumstances." *Cecio Bros., Inc.* v. *Feldmann,* 161 Conn. 265, 275, 287 A.2d 374 (1971); see *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 748, 557 A.2d 525 (1989); *Newington* v. *General Sanitation Service Co.,* 196 Conn. 81, 90, 491 A.2d 363 (1985). The determination " 'is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.' " *Cecio Bros., Inc.* v. *Feldmann,* supra; *Bernhard* v. *Rochester German Ins. Co.,* 79 Conn. 388, 398, 65 A. 134 (1906).

Since the court considered itself bound by *Gary Excavating Co.* to award interest to Walsh only from the date of the judgment confirming the award, it did not make a discretionary determination as to when the amount recoverable by Walsh under the policy was "payable" or whether it was "wrongfully detained" by Middlesex. We therefore remand Walsh's claim for prejudgment interest to the trial court for a discretionary determination of these issues on the merits. See *White Oak Corporation* v. *Department of Transportation,* supra.

In sum, we affirm the judgment of the trial court with respect to its determinations that: (1) Donald was a resident of Walsh's household; (2) Walsh made no material misrepresentations in his application for automobile liability insurance; and (3) Walsh was not barred from recovering under the policy by the doctrine of estop-

pel. We sustain Walsh's cross appeal seeking reversal of the court's ruling regarding interest, and we remand the case solely for a discretionary determination of the merits of Walsh's claim for prejudgment interest under § 37-3a.

In this opinion the other justices concurred.