VIRGINIA REMINGTON, ADMINISTRATRIX (ESTATE OF
WILLIAM K. REMINGTON) *v.* AETNA CASUALTY
AND SURETY COMPANY
(12560)

LAVERY, LANDAU, HEIMAN, FREEDMAN and SPEAR, Js.

Argued May 9*—decision released August 23, 1994

*Christopher Carrozzella,* for the appellant (plaintiff).

*Michael P. Del Sole,* with whom, on the brief, was
*Paula S. Giles,* for the appellee (defendant).

---

* This case was originally heard on March 24, 1994. It was reheard en
banc on May 9, 1994.

LAVERY, J. The plaintiff, Virginia Remington, appeals from the trial court's judgment granting the defendant's motion for summary judgment. The plaintiff claims that the trial court improperly determined as a matter of law that the decedent, William K. Remington, was not a resident of the plaintiff's household and, thus, was not a family member eligible for underinsured motorist coverage under the terms of the plaintiff's automobile insurance policy issued by the defendant. We agree with the plaintiff and reverse the judgment of the trial court.

William K. Remington, the stepson of the plaintiff, was killed in an automobile accident in 1990. At the time of the decedent's death, the plaintiff was insured by the defendant under an automobile policy that included underinsured motorist coverage for all covered persons. The policy defined "covered person" as "you or any family member." "Family member" was defined as a "person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child."

After the plaintiff received $10,000 in reparations from the driver responsible for the accident, she filed a claim for underinsured motorist coverage with the defendant. The plaintiff claimed that the decedent was a "covered person" under the policy. The defendant moved for summary judgment on the amended complaint, claiming that the decedent was not a "covered person" because (1) he was not a resident of the insured's household at the time of the accident, and (2) he was no longer related to the plaintiff. The trial court granted the motion, ruling that because the defendant had shown that the decedent was not a resident of the plaintiff's household at the time of the accident, there existed no genuine issue of material fact and the defendant was entitled to judgment as a matter of law. The plaintiff appealed.

## I

The standard of review of a trial court's decision to grant a motion for summary judgment is well established. Pursuant to Practice Book § 384, summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates,* 219 Conn. 772, 780–81, 595 A.2d 334 (1991). A "material fact" is a fact that will make a difference in the result of the case. *Hammer* v. *Lumberman's Mutual Casualty Co.,* 214 Conn. 573, 578, 573 A.2d 699 (1990). Once the movant demonstrates the nonexistence of any genuine issue of material fact, Practice Book § 380 requires the nonmovant to present "affidavits and other documentary proof" establishing the existence of a genuine issue of material fact. *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates,* supra, 781; *Connell* v. *Colwell,* 214 Conn. 242, 246, 571 A.2d 116 (1990). The trial court must view the evidence in the light most favorable to the nonmovant. *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates,* supra, 781.

In this case, the defendant had to show the absence of a genuine issue regarding whether the decedent was a covered person at the time of the accident. The trial court found that the defendant had sustained this burden by demonstrating that the decedent was not a resident of the plaintiff's household at the time of the accident. The record on which this ruling was based reveals the following. Born in 1952, the decedent lived with his father, Robert Remington, and the plaintiff from the time of their marriage, in 1966, until his father's death in 1987. The decedent suffered head injuries in a 1965 automobile accident that were serious

enough to cause temporary blindness and permanently impair his vision. The plaintiff testified that she handled the decedent's financial affairs and generally "guided him along."

When the plaintiff moved to Cheshire after her husband's death, the decedent took up residence with his brother in Hamden. Although she lived in Cheshire, the plaintiff's name was on the lease for the Hamden apartment. When the decedent moved with his brother to a different apartment in Hamden in 1989, the plaintiff paid rent on his behalf. The decedent returned to live with the plaintiff in January, 1990. Shortly thereafter, the decedent moved to a nearby motel. He again returned to the plaintiff's home one week later. In February, 1990, the decedent moved to the Hamden apartment, where he resided until his death. The plaintiff had found the apartment, rented it and listed the telephone in her name, and paid the rent from her own funds.

While the decedent lived in Hamden, the plaintiff and decedent visited often and spoke by telephone several times each day. The plaintiff kept some of her late husband's clothes at her home for the decedent's use. She also maintained one of the bedrooms at her home as the decedent's although others used the room. The plaintiff received the decedent's unemployment checks at her home as well as the majority of his mail. Although the decedent used the plaintiff's home as his permanent residence, he was registered to vote in Hamden, and listed Hamden as his address on his 1990 federal tax return.

In light of this evidence, the trial court stated that it found that the decedent was not a resident of the plaintiff's household at the time of the accident that resulted in his death. Accordingly, the trial court ruled that the defendant was entitled to judgment as a matter of law.

"[C]onstruction of a contract of insurance presents a question of law for the [trial] court which this court reviews de novo." *Aetna Life & Casualty Co.* v. *Bulaong,* 218 Conn. 51, 58, 588 A.2d 138 (1991). Policy language must be interpreted reasonably; words are to be given their ordinary meaning in order to deduce the intent of the parties. *Aetna Casualty & Surety Co.* v. *CNA Ins. Co.,* 221 Conn. 779, 786, 606 A.2d 990 (1992); *Hammer* v. *Lumberman's Mutual Casualty Co.,* supra, 214 Conn. 583. Any ambiguity in the meaning of the terms of the policy is resolved against the insurance company. *Hammer* v. *Lumberman's Mutual Casualty Co.,* supra, 584; *LaBonte* v. *Federal Mutual Ins. Co.,* 159 Conn. 252, 256, 268 A.2d 663 (1970).

In defining "resident of the same household," our courts have construed the term "household" in accordance with its ordinary, dictionary meaning. *Middlesex Mutual Assurance Co.* v. *Walsh,* 218 Conn. 681, 686, 590 A.2d 957 (1991); *Lawrence* v. *New Hampshire Ins. Co.,* 29 Conn. App. 484, 492, 616 A.2d 806, cert. denied, 224 Conn. 923, 618 A.2d 528 (1992); see also *Griffith* v. *Security Ins. Co.,* 167 Conn. 450, 454, 356 A.2d 94 (1975) (phrase resident of same household is not ambiguous). The 1991 edition of the American Heritage Dictionary defines household as "[a] domestic establishment including the members of a family and others who live under the same roof."[1] Thus, the definition of household reveals two primary characteristics: a close, familial relationship and joint occupation of a dwelling. *D'Addio* v. *Connecticut Ins. Guaranty Assn.,* 30 Conn. App. 729, 734, 622 A.2d 609, cert. denied, 226 Conn. 903, 625 A.2d 1375 (1993); *Lawrence* v. *New Hampshire Ins. Co.,* supra, 492.

---

[1] Webster's Third New International Dictionary similarly defines household as "those who dwell under the same roof and compose a family: a domestic establishment; specif: a social unit comprised of those living together in the same dwelling space." See *Middlesex Mutual Assurance Co.* v. *Walsh,* supra, 218 Conn. 686; *Griffith* v. *Security Ins. Co.,* supra, 167 Conn. 454.

Although the familial bond between the decedent and the plaintiff is not seriously disputed, a conglomeration of factors, including the intent of the decedent, must be considered to determine whether the plaintiff and the decedent shared a dwelling. See *Middlesex Mutual Assurance Co.* v. *Walsh,* supra, 218 Conn. 687. "Intent is clearly a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case." *Suarez* v. *Dickmont Plastics Corp.,* 229 Conn. 99, 111, 639 A.2d 507 (1994). "[S]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of . . . intent . . . ." Id. In finding that no genuine factual dispute existed regarding the decedent's residency, the trial court must have found that the defendant would be entitled to a directed verdict on the basis of these facts. *Connell* v. *Colwell,* supra, 214 Conn. 247. Viewing the evidence in the light most favorable to the plaintiff, however, we cannot agree that the defendant would be entitled to judgment as a matter of law on the issue of the decedent's residence. Despite the existence of significant evidence that the decedent was not a resident of the plaintiff's household, the plaintiff introduced evidence sufficient to support a determination in her favor by a reasonable fact finder. We hold, therefore, that the trial court improperly granted summary judgment on the issue of the decedent's residency.

## II

The defendant also claims that, as a matter of law, the decedent was not a covered person because he was not related to the plaintiff at the time of the accident. Although the trial court based its ruling solely on its residency determination, and although our resolution of that issue disposes of this appeal, we consider the defendant's assertion because it may recur on remand. If, on remand, the plaintiff establishes that the defend-

ant was a resident of her household, she will then have to prove that the decedent was related to her at the time of the accident.

When the plaintiff married Robert Remington, she became the decedent's stepmother. "The stepparent-stepchild relationship is one based on affinity. Affinity is 'the connection existing in consequence of marriage between each of the married persons and the kindred of the other.' *In re Bordeaux's Estate,* 37 Wash. 2d 561, 565, 225 P.2d 433 (1950); annot., 26 A.L.R.2d 271." *Lavieri* v. *Commissioner of Revenue Services,* 184 Conn. 380, 383, 439 A.2d 1012 (1981). Affinity is distinguished from consanguinity, which is relationship by blood. *In re Bordeaux's Estate,* supra, 565.

The defendant asserts as a general proposition that affinity terminates with the end of the marriage that created it. Thus, the defendant asserts that when Robert Remington died, thereby terminating the marriage,[2] the plaintiff and decedent were no longer stepchild and stepparent, regardless of their intent and their conduct toward each other. Conversely, the plaintiff claims that her affinal relationship with the decedent survived her husband's death.

As a general statement of law, the defendant's assertion is incorrect. In 1950, in a scholarly and persuasive discussion, the Supreme Court of Washington demonstrated that there was no absolute principle, nor had one ever existed at common law, that affinity was broken on the death of the spouse whose marriage created it. *In re Bordeaux's Estate,* supra, 37 Wash. 2d 565-74. Rather, the survival of affinal relationships depends on the context in which they are asserted. *Lavieri* v. *Commissioner of Revenue Services,* supra, 184 Conn. 384. Thus, in the context of succession taxes, step relation-

[2] General Statutes § 46b-40 (a) provides in part that "[a] marriage is dissolved . . . by (1) the death of one of the parties . . . ."

ships are not terminated by either divorce or death. Id., 386; see also *Depositors Trust Co. of Augusta* v. *Johnson,* 222 A.2d 49, 52 (Me. 1966); *In re Bordeaux's Estate,* supra, 589 and cases cited therein. Our Supreme Court based its ruling in *Lavieri,* at least in part, on the modern tendency " 'to assimilate the stepchild to the natural child.' " *Lavieri* v. *Commissioner of Revenue Services,* supra, 385.

In other contexts, however, step relationships have not been extended beyond the end of the marriage that created them. For example, a stepfather did not commit incest when he cohabited with his stepdaughter after the death of her mother. *Wilson* v. *Connecticut,* 6 Law Rptr. 452 (Conn. 1843). Similarly, where a party had been married to a judge's aunt, that judge was not disqualified from hearing a suit involving the party after the aunt died. *Winchester* v. *Hinsdale,* 12 Conn. 88 (1837).

In the context of underinsured motorist coverage, we conclude that affinity does not necessarily terminate at the end of the marriage that created it by the death of the biological parent. The definition of affinity leads us to this result. As we have noted, affinity is the connection between a married person and their spouse's kindred. Although that connection can be terminated voluntarily, the death of the biological parent does not necessitate the end of that connection. B. Berkowitz, "Legal Incidents of Today's 'Step' Relationships: Cinderella Revisited," 4 Fam. L.Q. 209, 226–27 (1970). Indeed, the death of a spouse and parent can strengthen the ties of affinity. Where the stepparent continues in the role of a parent to the child after the death of the biological parent, the nature of the actual connection between the two—the essence of affinity— has not changed. Neither should it be deemed to have changed in law.

We also note that the contrary conclusion, that affinity terminates automatically with the end of a marriage through the death of the biological parent, would lead to absurd results. If, for example, the stepparent is the insured, it would make no sense for a stepchild to be excluded from coverage if killed moments after the death of his or her biological parent in the same accident but covered if killed moments before the biological parent. We decline to adopt an interpretation that could cause such arbitrary and inconsistent results. See *Lavieri* v. *Commissioner of Revenue Services,* supra, 184 Conn. 383–84, citing *Sullivan* v. *Union & New Haven Trust Co.,* 147 Conn. 178, 181, 158 A.2d 174 (1960).

Our conclusion in this case also comports with our general policy in interpreting insurance contracts. Where the terms of an insurance policy can be interpreted in two ways, we adopt the construction that covers the loss. *Avis Rent A Car System, Inc.* v. *Liberty Mutual Ins. Co.,* 203 Conn. 667, 672, 526 A.2d 522 (1987). Finally, our conclusion accords with our Supreme Court's observation of the appropriate policy toward stepchildren. " '[T]he rights of stepchildren have been but slowly established through the years, and always in direct opposition to the common law, "whose fundamental pronouncement is that the mere relationship of stepparent and stepchild confers no rights and imposes no duties." 4 Vernier, American Family Laws, 485 § 268. But the modern tendency has been, and rightly so, to assimilate the stepchild to the natural child. See Note, 52 Harv. L. Rev. 515 [1939].' " *Lavieri* v. *Commissioner of Revenue Services,* supra, 184 Conn. 385.

In sum, we conclude that, in the context of underinsured motorist coverage, affinity does not terminate automatically upon the termination of the marriage that created it by the death of the biological parent. Rather,

where the stepparent voluntarily continues in the role of parent to the stepchild after the death of the biological parent, the incidents arising out of that relationship also continue.

The defendant also claims that only a minor can be a stepchild and, thus, regardless of whether affinity survives death, the decedent was not related to the plaintiff because he was thirty-eight when he died. This claim is without merit. Age is not relevant to the affinal relationship. The stepchild in *Lavieri* was in her midforties when her affinal relationship was upheld by our Supreme Court. The definition of affinity does not depend on the age of the parties or the kindred.

Therefore, if the evidence establishes that the decedent was a resident of the plaintiff's household, the relationship between the plaintiff and decedent will need to be considered. If the evidence establishes that the plaintiff voluntarily continued in the role of parent to the decedent, then the plaintiff and the decedent were related by affinity, regardless of the death of Robert Remington.

We conclude that the trial court improperly granted the defendant's motion for summary judgment on the issue of the decedent's residence.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion LANDAU, HEIMAN and SPEAR, Js., concurred.

FREEDMAN, J., concurring. I concur in part I of the majority opinion and I concur in the result reached in part II of the majority opinion. I write separately in order to voice my disagreement with the test enunciated by the majority in part II regarding when a stepparent-stepchild relationship should be deemed to outlive the marriage that created that relationship.

The majority holds that "in the context of underinsured motorist coverage, affinity does not terminate automatically upon the termination of the marriage that created it by the death of the biological parent. Rather, where the stepparent voluntarily continues in the role of parent to the stepchild after the death of the biological parent, the incidents arising out of that relationship also continue." The majority goes on to say "[i]f the evidence establishes that the plaintiff voluntarily continued in the role of parent to the decedent, then the plaintiff and the decedent were related by affinity, regardless of the death of Robert Remington." I believe this holding to be inappropriate to the stepparent-stepchild relationship as it exists today.

The current state of the law in Connecticut on the topic of stepparent-stepchild relationships is anything but clear and uniform. Instead, we have nineteenth century case law holding that in some contexts death or divorce terminates the affinal relationship between a stepparent and stepchild,[1] and twentieth century case law holding that in other contexts neither death nor divorce terminates the affinal relationship between stepparent and stepchild.[2] The law from other jurisdictions is equally conflicted.[3]

---

[1] See *Winchester* v. *Hinsdale,* 12 Conn. 87 (1837) (judge is not disqualified from hearing suit involving party who was previously married to judge's aunt); *Wilson* v. *Connecticut,* 6 Law Rptr. 452 (Conn. 1843) (stepfather does not commit incest by cohabiting with daughter of his deceased wife).

[2] *Lavieri* v. *Commissioner of Revenue Services,* 184 Conn. 380, 383, 439 A.2d 1012 (1981) (stepdaughter is still relative for purposes of inheritance tax, even though her mother had divorced and predeceased her stepfather from whom she was inheriting).

[3] See *In re Bordeaux's Estate,* 37 Wash. 2d 561, 225 P.2d 433 (1950), for an in depth, scholarly, though dated, discussion of legal decisions relating to the existence of an affinal step relationship after the termination of the marriage that created that relationship.

In light of the contradictory and at times confusing jurisprudence on the issue of stepparent-stepchild relationships, we would do a far better service to the development of the law, and would be in keeping with the times, by holding that a stepparent-stepchild relationship, though created by a marriage, endures beyond that marriage, no matter how the marriage is terminated.

Although the conclusion I reach is a departure from the common law " ' "whose fundamental pronouncement is that the mere relationship of stepparent and stepchild confers no rights and imposes no duties" ' "; *Lavieri* v. *Commissioner of Revenue Services*, 184 Conn. 380, 385, 439 A.2d 1012 (1981), citing 4 C. Vernier, American Family Laws (1936) § 268, p. 485; such a departure is called for in light of the profound ways in which the structure of the American family has changed. There is no question that the incidence of marriage dissolution, remarriage and the creation of stepparent-stepchild relationships has risen dramatically in the last few decades.

A recognition of the enduring affinity between stepparents and stepchildren would also be a realistic accommodation to the reality that in many situations children are not able to be adopted by their stepparents because they have noncustodial biological parents whose rights have not been terminated.[4] Despite the absence of a formal adoption proceeding, many stepparent-stepchild relationships are as close or closer than biologic parent-child relationships. It has long been recognized that a stepparent and stepchild can develop a significant emotional relationship regardless of the biological or legal relationship between them.[5]

---

[4] See S. Bysiewicz, "Steprelationships in Connecticut," 60 Conn. B.J. 378, 382–83 n.4 (1986).

[5] J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973) p. 19.

The law of Connecticut should move toward supporting and recognizing this relationship, through the protection of stepparent-stepchild relationships unless there is some specific exclusion of the stepparent or stepchild from the provisions of a statute, contract, or other vehicle being examined. In this case, where the underlying context is an underinsured motorist policy, the contractual language covers those persons related by blood, marriage or adoption. The plaintiff and the decedent are clearly related through the marriage of the plaintiff and the decedent's father. In the absence of contractual language excluding from coverage persons related by marriage after the death of the person whose marriage initiated their relationship, there is no justifiable reason for the courts to find that the stepparent-stepchild relationship terminated by operation of law upon the death of the biological parent.[6] Nor is there any reason to impose a test that requires a subjective examination of the physical and emotional ties surrounding the stepparent-stepchild relationship.

The majority holds that the affinal relationship between stepparent and stepchild "does not terminate automatically" leaving our state's lower courts to engage in cumbersome, awkward, situational analysis of whether affinity continues beyond the termination of a marriage in any given case. A court should not be forced to decide how much contact, how much financial support, how many telephone calls, how many birthday cards, or how many conversations constitute the continuation of the stepparent-stepchild relationship. I would instead hold that once a stepchild, always a stepchild, in all contexts, regardless of how a marriage

---

[6] Such a holding would also be inconsistent with the established principle that we should construe an insurance contract strictly against the insurance company. *LaBonte* v. *Federal Mutual Ins. Co.*, 159 Conn. 252, 256, 268 A.2d 663 (1970).

between the biological parent and stepparent has terminated, unless the statute, contract or other vehicle being examined provides otherwise.

Because I believe it is time for our law to recognize that once a stepchild, always a stepchild, regardless of the state of the marriage creating the step relationship, I cannot join in the reasoning of the majority in part II of the majority opinion.