[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE APPLICATION FOR RESTRAINING ORDER
The petitioner, Michelle Odom, has filed an application for a restraining order under General Statutes § 46b-15. Although the respondent did not appear for the hearing before this court held on March 25, 2002, the applicant established that a state marshal on March 19, 2002, made personal service of the application on the respondent, summoning her for the court hearing. The applicant further proved that she had been "been subjected to a continuous threat of present physical pain or physical injury" by the respondent. The only question remaining in the present case is whether the respondent, who is the ex-wife of the CT Page 4897 applicant's brother, is properly subject to a restraining order. Upon the facts proven at the hearing, the court, pursuant to § 46b-15 (b), found good cause to continue the ex parte restraining order while it considered this question. For the foregoing reasons, the court now finds that the applicant and respondent meet the statutory criteria for application of § 46b-15 and grants the restraining order, as set forth in the final two paragraphs of this decision. The legislature has authorized the granting of orders for relief from physical abuse against a "family or household member," as that term is defined in General Statutes § 46b-38a. Is a former sister-in-law a "family or household member?" Our Supreme Court has described "the process of statutory interpretation" as involving "a reasoned search for the intention of the legislature."
 In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.
(Citations omitted; internal quotation marks omitted.) Bender v. Bender,258 Conn. 733, 741, 785 A.2d 197 (2001). Section 46b-38a (2) defines "family or household member" to mean
 (A) spouses, former spouses; (B) parents and their children; (C) persons eighteen years of age or older related by blood or marriage; (D) persons sixteen years of age or older other than those persons in subparagraph (C) presently residing together or who have resided together; (E) persons who have a child in common regardless of whether they are or have been married or have lived together at any time; and (F) persons in, or have recently been in, a dating relationship.
The literal text of the statutory definition does not resolve the question, since it includes relationship by blood or marriage within the term, and we must thus also consider the other applicable principles.
The obvious legislative policy behind both the restraining order CT Page 4898 statute, § 46b-15, and the definitional statute, § 46b-38a (2), is to provide legal protection from incidents of family violence. In 1986 the legislature extended the statutory definition of parties covered in the original restraining order act, Public Act 81-272, from "adult persons," to include "family and household members" (P.A. 86-337, § 7). That 1986 legislation included comprehensive changes to the general statutes to enhance legal protection for the victims of domestic violence; these included mandatory arrest by police officers who had probable cause to believe a family violence crime had been committed; issuance of protective orders in criminal family violence prosecutions; criminal sanction for violation of those protective orders; and a pretrial family violence education program for persons arrested for family violence crimes.
In 1999 the legislature expanded the parties covered by the civil restraining order statute and criminal court family violence program to include "persons in, or [who] have recently been in, a dating relationship." (P.A. 99-186.) Discussion of this amendment on the floor of the state House of Representatives shows the legislature's awareness that the term "dating relationship" had some ambiguity that courts would have to resolve on a case-by-case, contextual basis. As judiciary committee co-chair Michael Lawlor, asked and answered, "Is it one date or is it coffee and you carpool with someone for three weeks?" (H.R. Proceedings, 1999 Sess. May 28, 1999, p. 3542.) "A dating relationship, it's going to have to be one of those, you know it when you see it- type situations." (Id. at 3540.) Similarly, Representative Ward concurred that "it maybe a little tough to have a clear definition of what a dating relationship is, whether that's once to the movies or three times. Frankly that's not important that we define it because a judge will do that when he is determining whether or not a protective order ought to be there." (H.R. Proceedings, 1999 Sess., May 28, 1999, p. 3556.)
In extending the statute to encompass dating relationships, the legislature has thus shown that restraining orders are intended to apply to those in familial, or quasi-familial relationships, ones that have aspects of intimacy, or repeated contact, or personal familiarity in ways that differ from mere friendship: "a relationship which is more than — certainly more than strangers or more than a casual friend, some type of personal relationship that goes beyond the run of the mill acquaintance-type situation." (Id. at 3554.) The entire legislative scheme is intended to offer legal protection to people where the threat or risk of violence derives from the powerful feelings that can occur in these intimate personal relationships. As Senator Jepsen explained on the floor of the Senate, the domestic violence legislation is intended to address and protect against the violence that occurs where "there's an underlying relationship between the parties and what drives the violence CT Page 4899 is the same kind of rage associated with domestic violence." (Sen. Proc., 1999 Sess., June 7, 1999, at p. 3195.) The facts of the present case show that very same motivation; one driving force behind the rage and threats shown by the respondent here was surely the present and former relationship of all the parties involved.
Our courts have several times had to consider the question of whether divorce extinguishes "affinity," the legal term used to denote "the connection existing in consequence of marriage between each of the married persons and the kindred of the other. Affinity is distinguished from consanguinity, which is relationship by blood." (Citations omitted; quotations omitted." Remington v. Aetna Casualty Surety Co.,35 Conn. App. 581, 587, 646 A.2d 266 (1994), on appeal after remand,240 Conn. 309, 692 A.2d 399 (1997). Our appellate courts have rejected the proposition that death or divorce necessarily terminates the relationship of affinity. Thus, in Remington, the court found an unadopted stepchild to be a member of a deceased person's household for purposes of uninsured motorist coverage. In Lavieri v. Comm. Of RevenueServices, 184 Conn. 380, 385, 439 A.2d 1012 (1981), our Supreme Court held that "in the inheritance tax context, the `step' relationship continues after the termination of the marriage which created it." The courts have thus held that "the survival of affinal relationships depends on the context in which they are asserted." Remington v. Aetna Casualty Surety Co., 35 Conn. App. 587. In Treat v. Verderame, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 66167 (July 14, 2000, Shay, J.), for example, the court granted a § 46b-15
restraining order against a father in favor of a maternal grandmother who had legal guardianship of his minor child: "[w]hile it may be argued that a legal relationship no longer exists arising out of the marriage, the fact remains that his blood and her blood both run through the veins of the minor child." Id.
In considering affinity, as with assessing whether parties have a dating relationship, the court must look at the entire factual situation. Does the threat of violence derive from the powerful and, unfortunately, too often uncontrolled feelings generated in families created by blood or marriage? The factual context of the present case, together with the inherent nature of § 46b-15 proceedings, establishes that the affinity relationship in question here, that of former sisters-in-law, remains intact for purposes of the restraining order proceedings. Here, the applicant tried to intervene in a dispute between her brother and his ex-wife, who is the respondent here, about their child. The brother has legal custody of the child in question. The respondent had threatened, during a visitation with her child, to kill herself and the child. The applicant's brother called the applicant and told her what had transpired. The applicant went to his house, where she CT Page 4900 found the respondent and the child in question sitting in the respondent's car outside the brother's house. The applicant asked the respondent to return the child to the father or face potential arrest for custodial interference, after which "Helen became like a wild woman." (Quoting from Application for Restraining Order.) The respondent then physically attacked and injured the applicant. The facts of this case show, unequivocally, that the very harm and threat to the applicant's safety resulted from the powerful feelings and emotions generated by conflicts between those related by blood or marriage.
This court thus concludes that the restraining order statute is indeed applicable to protect one former sister-in-law against a former sister-in-law. Their relationship arose out of marriage, but though matrimony has ended, the "affinity" of the parties survives. Accordingly, the court grants a restraining order prohibiting the respondent from imposing any restraint upon the person or liberty of the applicant; threatening, harassing, assaulting, molesting, sexually assaulting, or attaching the applicant; or entering the applicant's dwelling or family dwelling. The court orders the respondent not to stalk the applicant, not to enter the applicant's place of employment, and to stay one hundred yards from the applicant at all times. The respondent shall not initiate any contact in any manner with the applicant. The court extends these orders of protection to applicant's sister, Constance Odom. The court further orders the respondent not to call the applicant or her sister, Constance, at their home or anywhere else.
This order shall remain in effect for six months from this date.[1]
The applicant may, within that six-month period, request an extension of the restraining order, but any such request will not, by itself, automatically extend the six-month period; a judge of the Superior Court may or may not do so depending on the facts and circumstances presented at hearing then.
SO ORDERED.
BY THE COURT
 ___________________ STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT