[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff American Savings Bank (hereinafter "American") CT Page 3185 seeks a declaratory judgment to determine if American can invoke 6.2 of its lease of property within the shopping mall owned by defendant Nod Brook Mall Associates Limited Partnership (hereinafter "Nod Brook") to prevent Mechanics Savings Bank (hereinafter "Mechanics") from continuing to lease space on property owned by the defendant at that location. Based on the evidence presented at trial, the court finds in favor of the defendants as to all counts of the plaintiff's Complaint.
This action arises out of the following facts which the court finds established by a fair preponderance of the evidence:
Effective July 1, 1972, Old Farms Realty, Inc. ("Old Farms") ground leased to Sydney Rosenblum ("Rosenblum") four adjacent parcels of land in Avon, Connecticut, which parcels were identified as parcels A-1, A-2, B C. On July 5, 1972, Rosenblum ground leased Parcel A-1 (hereinafter the "Jack August property" ) to Jack August of Avon, Inc . ("Jack August"). The Jack August property was located at 321 West Main Street, Route 44, Avon, Connecticut; the remainder of the property was located at 311 West Main Street, Route 44, Avon Connecticut.
On July 5, 1972, Rosenblum and Jack August signed a written amendment to the Jack August lease creating cross-parking privileges between the Jack August property and the "other premises of Lessor [Rosenblum], being the shopping center of Lessor located to the rear of and in the areas generally easterly of premises of Lessee, and the parties further agree that each of them will do nothing to impair the free flow of traffic between said other premises of Lessor and the demised premises of Lessee." Rosenblum also agreed to provide an "access road" to serve the Jack August property.
On July 21, 1972, Jack August applied to the Avon Planning Zoning Commission for permission to use the Jack August property for a restaurant with alcoholic beverages. Jack August's application was approved July 25, 1972 and Jack August thereafter submitted a site plan for the Jack August property to the Commission.
On November 28, 1972, Rosenblum applied to the Avon Planning and Zoning Commission to locate a Thrifty Home Center on "4 acres +" on Route 44 in Avon. Parcel A-2 consisted of 4.41 acres and was the proposed site of the Thrifty Home Center. On January 9, 1973, the Avon Zoning and Planning Commission approved Rosenblum's CT Page 3186 application for the Thrifty Home Center.
On January 23, 1973, Rosenblum applied to the Avon Zoning and Planning Commission to subdivide the four parcels he had ground leased from Old Farms. On March 23, 1973, Rosenblum borrowed $250,000 from Jack August to fund construction of the restaurant and improvements on the Jack August property as required by the Jack August lease. The construction loan from Jack August to Rosenblum was secured by a mortgage of Rosenblum's and Old Farms' interest in the Jack August property. The mortgage deed from Old Farm to Jack August was recorded on the Avon land records on April
On August 27, 1973, Rosenblum executed a lease with Marshall's of Connecticut, Inc. for a "25,000 square foot store located in the building and shopping center to be constructed in Avon, Connecticut." On February 24, 1974, Jack August entered into an agreement with Old Farms wherein Old Farms consented to the Jack August lease and agreed to be bound by the Jack August lease in the event of the-"cancellation, termination, expiration or surrender" of the ground lease between Rosenblum and Old Farms.
On March 4, 1974, Rosenblum executed a collateral assignment of leases and rentals with Society for Savings. The assignment listed two leases: the Jack August lease and the lease to Marshall's "in the building and shopping center to be constructed in Avon, Connecticut." The assignment listed two pieces of real property as being affected by the assigned leases: the "FIRST PIECE" consisted of parcels A-2, B and C (the "Shopping Center Property:); the "SECOND PIECE" of property was the Jack August property, Parcel A-1. The assignment was recorded on the land records the day it was signed. On March 21, 1974, the Avon Zoning and Planning Commission approved a revised subdivision plan separating the four parcels into two lots: one lot consisted of the Jack August property [Parcel A-1] and the other lot consisting of the Shopping Center Property [parcels A-2, C and B]. [Exhibit 17].
On February 27, 1974, James F. Dewey, director of marketing for American, sought Rosenblum's agreement to a letter of intent whereby American agreed to locate a branch in the "Avon Shopping Center," subject to regulatory approval and further lease negotiations between the parties. At that time, American was expanding its business and establishing branches throughout much of the state.
When leasing space in a small shopping center, American typically tried make sure that no finance company, loan business, thrift institution, commercial bank, savings and loan association or savings bank would locate itself near American's site. American's typical means of preventing another such institution from leasing space in the same shopping center was a restrictive CT Page 3187 covenant in its own lease.
In addition to searching for a location where it would be the only institution of its type, American sought the best location in terms of convenience, accessibility, and visibility. For its branch offices in shopping center, American tried to secure free-standing nites apart from the main buildings of the centers. American's office at Glen Lochen Mall in Glastonbury, for example, is a free-standing building within that shopping center, located a short distance from the main building of the center. Such a free-standing building, or "pad site" as it is called in commercial real estate, is a common feature of shopping centers. Typically, these sites are used to attract certain kinds of tenants, such as food franchises, banks and automotive stores and service centers, whose traffic patterns do not fit well with that of the main building. It is not unusual for a pad site to be bermed or otherwise distinguished from the rest of the shopping center even though it remains part of the center.
American officials considered the Avon banking market difficult to penetrate because of the "number and concentration of banking offices." At the time the American Avon branch opened there were approximately six competing bank branches within a half-mile of the American branch.
American began its negotiations with Rosenblum by asking for a pad site: a separate, free-standing building. American was told by Rosenblum that the sole pad site at the center was the one leased by Jack August. Rosenblum then offered a location on the western end of the main building, but American refused it because of insufficient space for parking or a drive-up facility. Finally, American accepted a place at the eastern end of the main building.
The negotiations between American and Rosenblum were primarily handled by Dewey, with some limited involvement by American President Norman E.W. Erickson. Legal counsel was not sought by either party. Dewey drafted the American lease himself, and Rosenblum represented himself, as well. During Dewey's negotiations with Rosenblum, issues were resolved very quickly and Dewey found Rosenblum to be quite agreeable. On February 20, 1975, Erickson executed a lease with Rosenblum on American's behalf[1] for 2,700 square feet of space "in the Shopping Center known as No. 311 West Main Street Route 44, Avon, Connecticut. . ." (The "American lease").
Jack August's restaurant on the Jack August property was open and operating during American's negotiations with Rosenblum regarding the American lease. During negotiations, while American was aware that the Jack August restaurant had been developed CT Page 3188 separately from the Shopping Center property and was open and operating on the Jack August property, Rosenblum's communications with American discussed his "proposed shopping center." During negotiations, American did not ask Rosenblum to see a copy of the Jack August lease, even though Mr. Dewey was aware that that lease might contain material which would affect American's rights with regard to parking at minimum.
During the negotiations, no representations were made by Rosenblum to American that the Jack August property was part of the "Shopping Center" as that term is used in the American lease, nor did American and Rosenblum ever discuss the fact that the Jack August property was a separate piece of property which had been subdivided from the Shopping Center Property. The term "Shopping Center" as it is used in the American lease was never defined in any communication between American and Rosenblum during the negotiation of the American lease. American officials never discussed the ownership of the Shopping Center Property with Rosenblum and relied instead on their own unspoken assumptions as to the land's ownership[2]. During the American lease negotiations, American officials did not conduct any review of the Land Records of the Town of Avon or the records of the Planning and Zoning Commission or examine the title to the Shopping Center Property.
The term "Shopping Center" used in the lease is not explicitly defined. While Section 1.1 of the lease refers to ". . .a diagram of the Shopping Center which is attached hereto and made apart hereof and marked Exhibit A", this Exhibit A has never been located. There are, however, references in the lease and in the Notice of Lease and a Non-Disturbance Agreement executed by Erickson subsequent to the signing of the lease which shed light on the area represented by use of the term "Shopping Center".
In 1.1, the American lease provides that American and "other tenants of Lessor [Rosenblum] in such shopping center of which the lease premises are a part" have cross-parking privileges with Jack August which give them the right to park "on the parking lot adjoining the leased premises and on the parking lot of the Jack August of Avon, Inc. property." (emphasis added). American agreed to the cross-parking provision and Dewey inserted the cross-parking provision in the draft of the American lease.
In 9 of the American lease, American agreed, to pay a proportionate share of real estate taxes with American's "proportion to be a fraction, the numerator of which is 2,700 of the Shopping Center." This definition of the property encompassed by the Shopping Center does not include the Jack August property and, for purposes of real estate property taxes, the Town of Avon considers the Jack August property and the CT Page 3189 Shopping Center Property to be separate pieces of property. Pursuant to American's policy of checking that proportionate charges such as those required by the American lease were properly calculated, American officials contacted the Town of Avon tax assessor's office to confirm that American was paying the correct share of the taxes on the "Shopping Center" under the American lease.
10.3 of the American lease obligated American to pay a proportionate share of common area costs determined "as the gross leaseable area of the premises demised to the Tenant shall bear to the gross leasable area of the Shopping Center." Rosenblum's charges for American's share of taxes, common area costs and insurance were based on a definition of "Shopping Center" which does not encompass the Jack August property and which was never considered inaccurate by American.
American has always paid its proportionate share of real estate taxes and common area charges based on a formula which includes only the square footage of the buildings on the Shopping Center Property in calculating the "total square feet of the Shopping Center" and American routinely double-checked to make sure the taxes were proportioned in accordance with American's understanding of the American lease.
Subsequent to signing the American lease, Erickson executed a Notice of Lease identifying the demised premises subject to the American lease as being "2,700 square feet of the building located in the shopping center on the premises known as No. 311 West Main Street, Route 44, Avon, Connecticut." On June 9, 1975, months after signing the lease, Erickson on behalf of American signed a Non-Disturbance Agreement with Society for Savings which was given to him by Dewey in connection with a mortgage on the Shopping Center Property. The Non-Disturbance Agreement references that American has leased premises on a piece of real property as set forth in a Schedule A. As kept in American's records, the Non-Disturbance Agreement has a Schedule A attached which describes the Shopping Center Property only and, therefore, excludes the Jack August property.
Dewey drafted the American lease using American's lease in the Glen Lochen shopping center in Glastonbury (the "Glen Lochen lease") as a prototype, handwriting changes from the Glen Lochen format. The copy with the handwritten changes became the draft from which the American lease took final form. The American lease and the Glen Lochen lease both include identical and directly contradictory provisions as to whether the parties intended it to include a restrictive covenant.[3]
In June of 1975, American opened its branch on the Shopping CT Page 3190 Center Property. On October 10, 1975, counsel for Rosenblum wrote to Dewey regarding American's obligations under the American lease to obtain insurance and instructed Dewey that "for identification purposes the shopping center is known as Nos. 311-315 West Main Street, Avon, Connecticut." (emphasis added.) On February 26, 1985, Dewey, on behalf of American, executed a Tenant's Estoppel Certificate for Connecticut National Bank wherein he identified the American lease as applying to "those certain premises commonly known and designated at 311 West Main Street, Avon, Connecticut." (emphasis added).
Ten years passed. On February 6, 1977, Rosenblum died. On March 25, 1980, Jack August assigned its ground lease of the Jack August property to B.C. Rest. of Avon, Inc. In July of 1983, Rosenblum's heirs assigned their interest in the Jack August property and the Shopping Center Property. On March 14, 1985, Nod Brook Mall Associates assigned its interest in the Shopping Center Property and the Jack August property to the Nod Brook Partnership. On May 19, 1986, B.C. Rest. of Avon, Inc. assigned its ground lease of the Jack August property to the Nod Brook Partnership.
By November or December of 1986, American learned that Mechanics was interested in relocating Mechanics' Avon branch to the Jack August property. Erickson objected to the possible location of a competing bank branch on the Jack August property claiming it was a superior location to American's site in the Shopping Center Property and claiming that the American lease included a restrictive covenant which prevented any other bank from locating on the Jack August property. The Nod Brook Partnership confirmed its opposition to any such claim in a letter dated March 13, 1987, asserting that the Jack August parcel was never subject to the restrictive covenant in the lease.
The Nod Brook Partnership offered to grant American a restrictive covenant on the Jack August parcel and allow American to locate an automated teller machine on the parcel without further rental charge in exchange for an agreement to increase the rent in the American lease to 80 percent of fair market value upon renewal of the American lease. Before finalizing negotiations with Mechanics, the Nod Brook Partnership gave American an opportunity to relocate its branch from the Shopping Center Property to the Jack August property. American refused the offer, asserting that the advantages of the Jack August property did not justify the increase in rent.
On October 29, 1987, Mechanics applied to the Connecticut Banking Commissioner for permission to relocate its Avon branch to 321 West Main Street, the Jack August parcel. By letter dated November 13, 1987 to the banking commissioner, American made CT Page 3191 formal objection to the relocation of the Mechanics branch to the Jack August property. On January 26, 1988 the banking commissioner approved the relocation of Mechanic's Avon branch to the Jack August property. The Commissioner determined that "the validity and enforceability of the restrictive covenant raises issues that are more appropriately resolved by the parties either directly or in a judicial forum." On March 25, 1988, Mechanics executed a lease with the Nod Brook Partnership for space on the Jack August property. The Mechanics branch on the Jack August property was constructed between March 1988 and March 1989 and the Mechanics branch opened during March of 1989.
While American opposed the entrance of Mechanics into the Shopping Center from the time it learned that such entry was contemplated, American at no point sought preliminary injunctive relief or a temporary restraining order to halt construction or operation of the Mechanics' branch on the Jack August property. By its Complaint dated April 7, 1988, American sought a declaratory judgment to determine if American could invoke 6.2 of the American lease to prevent Mechanics from leasing space on the Jack August property.
In order to decide in favor of the plaintiff, this court would have to find first that the American lease contained an effective and enforceable restrictive covenant and, second, that the restrictive covenant encompassed the Jack August parcel. The issue to be addressed concerning the enforceability of the restrictive covenant is not the reasonable or unreasonable nature of its terms but, rather, whether it is a valid and enforceable part of the American lease.
Axiomatic in the law of this state is:
 . . .the established principle of contract construction that where the terms of a contract are equally susceptible to two different meanings, that favoring the party who did not draw up the contract will be applied.
Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681, 694
(1991). Where the language of a contract is ambiguous, "it should be construed against rather than in favor of the [restrictive] covenant." Hooker v. Alexander, 129 Conn. 433, 436 (1942).
The American lease contains provisions which directly contradict each other: one provides that no restrictive covenant applies (17.7); the other sets forth a restrictive covenant. (6.2). American drafted the lease. The interpretation of the ambiguities in the lease must favor the party which did not draft the lease, namely, the defendant. Furthermore, because the language of the contract leaves unclear whether there exists a CT Page 3192 restrictive covenant, the contract must be construed against finding a covenant.
On that basis, the court finds that the American lease contains no valid and enforceable restrictive covenant. That determination alone entitles the defendant to prevail. Although the court need not reach the issue of whether a restrictive covenant if enforceable, would apply to the Jack August parcel, see Hallas v. Windsor, 212 Conn. 338, 347 (1989), the court will indicate that the preponderance of the evidence submitted supports the defendant's theory of nonapplicability to the Jack August parcel.
While the American lease, itself, does not formally define the term "shopping center", three provisions of the lease indicate that the Jack August parcel is not included within the scope of the leased premises. The cross-parking provision contained in 1.1 of the lease provides that American shall have the right to park "on the parking lot adjoining the leased premises and on the parking lot of the Jack August of Avon, Inc. property." (emphasis added). The real estate tax provisions and common-area charge provisions, 9 and 10.3 respectively, contain American's agreement to pay a proportionate share of the taxes and common area charges. The formula by which American's share is determined is based on "the total square feet of the Shopping Center" and the "gross leasable area of the Shopping Center" and includes only the square footage of the buildings on the Shopping Center property, not the Jack August parcel.
The conduct of American after the signing of the lease also indicates that the meaning of the term "Shopping Center" did not include the Jack August parcel. See Associated Catalog Merchandisers. Inc. v. Chagnon, 210 Conn. 734, 741 (1989). American paid its share of the property taxes and common area charges based on the formula which did not include the Jack August parcel, and routinely double-checked with the Avon Town Hall to verify that the amount owed was correctly computed. Erickson executed both a Notice of Lease and a Non-Disturbance Agreement which identified the leased premises without including the Jack August parcel.
Under Connecticut law:
 A restrictive covenant must be narrowly construed and ought not to be extended by implication. Neptune Park Assn. v. Steinberg, 138 Conn. 357, 361, 84 A.2d 687
(1951).
5011 Community Organization v. Harris, 16 Conn. App. 537, 541
(1988). The plaintiff has failed to sustain its burden of proof CT Page 3193 on the issue of extension of the restrictive covenant to the Jack August property as well.
For the foregoing reasons, the court enters judgment in favor of the defendant.
BARRY R. SCHALLER, JUDGE.