[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Summary Process action seeking possession of a gasoline station.
On January 29, 1996, GETTY PETROLEUM MARKETING, INC., as lessor, and BALDEV TULI, as lessee, entered into a written Retail Gasoline Station Agreement ("Lease") and Lessee Supply Contract ("Supply Contract"). The Lease and Supply Contract were for the use and occupancy of a retail gasoline station located at 170 Taftville-Occum Road in Norwich, Connecticut. The Lease and Supply Contract were both for a period of three years beginning on January 29, 1996 and ending on January 28, 1999.
On February 19, 1999, GETTY notified TULI that he was in arrears for certain amounts due and owing under the Lease and Supply Contract. On February 26, 1999, GETTY notified TULI of its intention to renew the contractual relationship with TULI. On April 12, 1999, GETTY gave TULI CT Page 7492 notice that he had a ten-day period to pay monies due and owing, thereby curing the defaults, or else the Lease and Supply Contract may be terminated or not renewed.
On August 3, 1999, GETTY notified TULI that the parties' Agreements were terminated effective October 8, 1999. On November 23, 1999, GETTY filed a summary process complaint against Baldev Tuli seeking possession of the Norwich gasoline station.
Defendant has raised the following issues why Summary Process should not issue:
A. Does A Franchise Relationship Exist So As To Invoke The Powers of The Connecticut Franchise Act (CFA)?
B. Did TULI receive proper notice under Connecticut's General Franchise Act of GETTY's intent to terminate the Lease?
C. Did GETTY have good cause to terminate the franchise?
D. Did GETTY waive its right to terminate the franchise?
E. Was GETTY estopped from enforcing its rights under the Lease and Supply Contract?
A. DOES A FRANCHISE RELATIONSHIP EXIST SO AS TO INVOKE THE POWERS OFTHE CONNECTICUT FRANCHISE ACT (CFA)?
In order to invoke the powers of the CFA, it must be shown that TULI'S relationship with GETTY is a franchise within the meaning of Connecticut General Statute 42-133e. Getty v. Ahmad, 25 Conn.L.Rptr. 436 (1999).
Under the state's general franchise statute, "a franchise is an oral or written agreement or arrangement which (1) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchiser, and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchiser's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchiser or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer." General Statutes Section 42-133e. CT Page 7493
Therefore, a franchise has two elements: "the right to offer goods or services (1) under a marketing plan or system substantially prescribed by the franchiser, and (2) being substantially associated with the franchiser's trade name." Getty v. Ahmad, supra, 440.
It is undisputed that the second requirement is met and that the defendant's business is substantially associated with the plaintiff's trademark, trade name or commercial symbol.
Therefore, the key issue is whether TULI had the right to offer goods or services under a marketing plan or system substantially prescribed by GETTY. In the past, courts have focused on the "amount of control exercised by the franchiser in the conduct of the franchisee's business as a significant factor" in determining this issue. Chem-Tek, Inc. v.General Motors Corp., 816 F. Sup. 123, 127 (D.Conn. 1993). Factors to consider include the franchiser's power to hire and fire employees, power over pricing, control over inventory, the existence of a marketing plan, requiring the training of employees, and the power to examine financial records and to audit. Getty v. Ahmad, supra, 440, citing HartfordElectric Supply v. Allen-Bradley Co., 1997 Ct. Sup. 5074, 19
Conn.L.Rptr. 363 (1997).
Additional factors that courts have looked to include whether the franchiser establishes sales quotas, provides financial support and management training, requires employee uniforms, reserves the right to inspect the station, has ultimate control over the use of advertising signs, reserves the right to set prices, requires illumination of the premises, or hires the employees. Also, whether the rent is based on the gallons of gasoline sold and whether the franchiser sets the hours of operation. Consumer Petroleum of Connecticut v. Duhan, 38 Conn. Sup. 495,452 A.2d 123 (1982).
The Second Circuit Court of Appeals has stated that these factors should be considered, along with any other factors indicating control over the franchisee, "according to their significance to the business relationship under review." Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1180 (2d Cir. 1995). The Second Circuit also found that a marketing plan's most fundamental aspect is pricing and that control of pricing by the manufacturer deprives distributors of independent judgment with respect to business decisions. Id., 1181. Here, the manufacturer-distributor relationship is analogous to the franchiser-franchisee relationship.
In determining whether a franchise relationship exists in the present case, a review of the amount of control retained by GETTY over TULI is necessary. The following findings require review to determine whether a franchise relationship exists or not: CT Page 7494
With respect to the Lease, TULI agreed to not use the station or any part of it for the rental, sale, repairs, or parking of automobiles without GETTY's prior written approval. TULI also agreed to not keep any dogs or "other dangerous animals at the station."
With respect to the Supply Contract, TULI assented to "enter into the business of operating a Getty gasoline station in accordance with the standards of quality and service approved by" GETTY as well as sell "the gasoline, motor oil and other products marketed and used by [Getty], as determined by [Getty]." Additionally, GETTY retained the right to set prices for products sold to the public as well as change prices at any time. Further, TULI agreed to use the station as a retail gasoline station only. He also agreed to use GETTY's insignias, brand names, labels, trade names, trademarks, imprints, or symbols to advertise and identify GETTY's products and not for any other purpose. TULI also agreed that all employees would be dressed in uniforms approved by GETTY.
TULI further agreed to provide GETTY with information regarding the number of gallons of gasoline and other products sold, including the total dollar amount, on a daily basis. This included permitting GETTY to inspect TULI's books and records relating to these sales as well as agreeing to provide "such other information as the company shall from time to time request, as in its judgment, it shall deem necessary." TULI further agreed to maintain accurate inventories for all products and to notify GETTY of any "unusual inventory discrepancies," including providing copies of those records to GETTY on request. TULI assented to operating the station in accordance with standards of care and quality, including cleanliness, service, and appearance, as set forth by GETTY. This included providing adequate illumination as well as neatly groomed employees who were to render "first class" service to customers.
Moreover, in the Supply Contract, TULI agreed to a monthly minimum gallonage requirement to be determined by GETTY. The Lease Agreement states that the requirement be set at eighty percent (800%) of the average gallonage sold during each of the first four months from commencement of the agreement. TULI agreed to pay as additional rent, the sum of $.06 per gallon for "the difference between the lesser quantity of gallonage sold during each month" and the minimum gallonage required be sold.
The Lease and Supply Contract also have a number of clauses in common that are relevant to the present inquiry. TULI agreed to sell only GETTY's gasoline, petroleum, and other merchandise as was approved by GETTY. GETTY required its approval on advertising and signs, including colors to be used in any signage displayed. GETTY also reserved the right CT Page 7495 to enter the station at any time for inspection purposes of both the premises and merchandise including obtaining gasoline samples as well as taking pump and gasoline stick readings. Lastly, TULI agreed to be open a minimum of eighteen (18) hours per day, seven (7) days per week.
In light of the factors enumerated in the state's general franchise statute, as well as the cases cited above, and based on the foregoing, it is clear that TULI was engaged in the business of operating, selling, and distributing goods under a marketing plan prescribed in substantial part by GETTY. Therefore, the two-part test set out in Connecticut General Statute Section 42-133e has been met and a franchise relationship does exist between GETTY and TULI.
B. DID TULI RECEIVE PROPER NOTICE UNDER CONNECTICUT'S GENERALFRANCHISE ACT OF GETTY'S INTENT TO TERMINATE THE LEASE?
A franchiser must give a franchisee written notice of termination of the franchise at least sixty days in advance of the termination with the cause stated thereon. General Statutes Section 42-133f(a). In the August 3, 1999 letter to TULI from GETTY's counsel, TULI was put on notice of both GETTY's intent to terminate as well as the reasons for such termination. While defense counsel argues in his Memorandum of Law dated May 30, 2000 that less than the statutorily mandated sixty days notice was given due to a September 9 date mentioned at the beginning of the notice, this court is not persuaded. As GETTY's counsel points out in his Objection and Response dated June 8, 2000, this claim was never made at trial nor was it asserted as a special defense. Further, a Notice to Quit was not served on TULI until October 15, 1999. At the conclusion of the August 3 letter, the termination date of October 8, 1999 is set out in bold-faced type with instructions on vacating the premises. Because the termination date was notice greater than sixty days, this court finds such notice to be sufficient under the General Franchise Act.
C. DID GETTY HAVE GOOD CAUSE TO TERMINATE THE FRANCHISE?
To terminate a franchise, a franchiser must have good cause. This includes the franchisee's "refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement. Id. On May 19, 2000, during the Summary Process trial for the present matter, Donna Lee Stewart, Regional Marketing Manager for GETTY, testified, and the Court credits her testimony, that TULI had breached various paragraphs of the Lease and Supply Contract. Each paragraph pertains to payments that TULI had agreed to make at the inception of the contractual relationship. Repeated failure to make payments constitutes good cause as defined in Section 42-133f(a). Clearly, payment is both a material and reasonable obligation of an agreement. Therefore, GETTY had CT Page 7496 good cause to terminate the franchise relationship with TULI.
D. DID GETTY WAIVE ITS RIGHT TO TERMINATE THE FRANCHISE?
TULI contends that GETTY waived its right to terminate the franchise when it sent TULI a letter dated February 26, 1999 indicating GETTY's intent to renew the contractual relationship with TULI. TULI maintains that by offering the new lease, GETTY waived any right to terminate on grounds of prior default because the offer actuated a relinquishment of its rights regarding TULI's default. "Waiver is the intentional abandonment of a known right . . . waiver is the voluntary relinquishment of a known right. It involves the idea of assent, and assent is an act of understanding . . . Intention to relinquish must appear, but acts and conduct inconsistent with intention to [relinquish] . . . are sufficient." Soares v. Max Services, Inc., 42 Conn. App. 147, 175,679 A.2d 37, cert. Denied, 239 Conn. 915; 682 A.2d 1005 (1996). While defense counsel argues that the offer of a new lease constituted a waiver, he has failed to show a voluntary relinquishment of a known right. Citing Lee v. Wright, 485 N.Y.S.2d 543, counsel states, ". . . knowing acceptance of rent without any efforts to terminate the lease justified inference that the landlord has chosen to hold the tenant as lessee and, therefore, waived any violation." Even if this court were bound by that decision, it is irrelevant here. GETTY merely offered a new lease and did not accept any rent under it.
GETTY continued to make demand for TULI to cure the default as is evidenced by the April 12, 1999 letter to cure as well as by a July 19, 1999 letter. GETTY manifested no intention whatsoever to relinquish its rights under the Lease or Supply Contract.
Even if it could be successfully argued that GETTY's course of conduct constituted a waiver under the Soares standard, both the Lease and Supply Contract contain "no waiver" provisions; "no waiver . . . shall be valid, unless such waiver . . . is in writing, and signed by the party against whom enforcement is sought."
Both the Lease and Supply Contract state, "Company's right to require strict performance shall not be affected by any . . . course of dealing." "While inconsistent conduct may, under certain circumstances, be deemed a waiver of a right to acceleration, the insertion of a nonwaiver clause is designed to avoid exactly such an inference." Christensen v. Curaia,211 Conn. 613; 560 A.2d 456 (1989). Therefore, even if GETTY's course of conduct in offering a new lease might otherwise constitute a waiver, the insertion of the nonwaiver clauses prevents such conduct from constituting a valid waiver. CT Page 7497
Because GETTY did not manifest an intention to relinquish its rights, because TULI has failed to provide a written waiver signed by GETTY, and because of the nonwaiver clauses, no waiver exists.
E. WAS GETTY ESTOPPED FROM ENFORCING ITS RIGHTS UNDER THE LEASE ANDSUPPLY CONTRACT?
A claim of estoppel requires proof of two elements: "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change position in reliance on those facts, thereby incurring some injury." Middlesex Mutual AssuranceCo., v. Walsh, 218 Conn. 681, 699; 590 A.2d 957 (1991).
Other than its claim regarding the offer of a new lease, TULI has offered no evidence that GETTY intended to induce TULI into believing that any prior defaults were waived. In fact, the opposite is true as shown by GETTY's April 12, 1999 request to cure the defaults as well as GETTY's change of conditions in the offered lease. TULI never signed the offered lease and, therefore, never changed his position in reliance of GETTY's new lease offer. GETTY is not estopped from enforcing its rights under the Lease and Supply Contract.
Judgment of possession enters in favor of the plaintiff.
Schimelman, J.